***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Jones and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS:
1. All parties are subject to the Worker's Compensation Act.
2. An Employee-Employer relationship existed between Linda Todd and Vitafoam, Inc. on or about August 16, 2000.
3. The Defendant-Employer had insurance coverage with The Hartford Insurance Company on August 16, 2000.
4. The alleged date of injury is August 16, 2000.
5. The Plaintiff's average weekly wage will be determined by the executed Form 22 Wage Chart.
6. The following documents were stipulated into evidence at trial:
 (a) Stipulated Exhibit #1: Plaintiff's medical records, a complete set of which was submitted post-hearing;
 (b) Stipulated Exhibit #2: Plaintiff's Answers to Defendant's First Set of Interrogatories;
(c) Stipulated Exhibit #3: Form 22 Wage Chart.
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy, Plaintiff was a seventeen-year employee with the Defendant-Employer, having had no prior work-related injuries or workers' compensation claims. Plaintiff worked as a tick cutter coordinator, and her job required her to cut cloth and transfer cloth to the sewing department, normally by hand. She worked on the third shift which overlapped the morning shift.
2. Beginning around March of 2000, Plaintiff was asked by her supervisor to assist a co-worker, Virginia Harris, who worked in the repair department, on an as-needed basis. Virginia Harris took apart return cushions, separating the covers from the pillows and stacked the pillows on work trucks. Plaintiff sometimes assisted Virginia Harris once a week, and sometimes would go a week or several weeks without assisting her.
3. On August 16, 2000, Plaintiff was assisting Virginia Harris with her work duties of tearing down cushions. As Plaintiff tried to toss a bundle of cushions onto a buggy already filled with cushions, she felt immediate pain in her left arm. Plaintiff grabbed her left arm and exclaimed, "Oh, God, I hurt myself". The Plaintiff did not toss cushions as a part of her own job. This physical activity was called for only when assisting Virginia Harris. Virginia Harris assisted the Plaintiff in getting to the supervisor and ice was placed on her arm.
4. Although the Plaintiff may have helped Virginia Harris toss "spring loaded cushions" at some point, it was not something Plaintiff did frequently or routinely and was not a regular part of plaintiff's work duties or job routine. The cushions Plaintiff was working with that day also were heavier and larger than those with which she was accustomed when helping Virginia Harris.
5. At the time of Plaintiff's injury, neither Plaintiff nor Virginia Harris were working in their usual work area. They were instead in a crowded, cramped area, having to lift cushions up off the floor without much room to maneuver. The Plaintiff was also tossing cushions onto a cart that was larger and taller than those she normally worked with, causing the stack of cushions placed onto it to be higher than usual. Virginia Harris corroborated Plaintiff's testimony in this regard at the hearing.
6. The task of tossing the heavier cushions onto a taller cart with higher stacks of cushions, while working in a crowded workspace, was an interruption of Plaintiff's normal work routine and the introduction thereby of unusual conditions.
7. Plaintiff continued to work until receiving medical treatment at MedCentral on September 27, 2000. Plaintiff relayed a history of injuring her left shoulder while tossing cushions at work. Plaintiff was prescribed medication and physical therapy and diagnosed with a left shoulder strain and probable rotator cuff.
8. By October 11, 2000, Plaintiff had improved almost "100%", and she was released from care by MedCentral. On November 10, 2000, Plaintiff returned to MedCentral complaining again of left shoulder pain. From the time of her release, Plaintiff had continued to experience left shoulder pain, especially while raking or bowling. Also, Plaintiff reported that two days prior, she had to lift heavier rolls of foam at work which caused even more pain in her shoulder than when she had first sought medical treatment in September. The Plaintiff was continued on her medication and referred to an orthopedist for evaluation of a possible rotator cuff tear.
9. Plaintiff was seen by Dr. David Ross, orthopedist, in November of 2000. Plaintiff reported her work injury of August 16, 2000. She had not had any shoulder pain prior to this injury. Dr. Ross found symptoms of positive impingement of Plaintiff's left shoulder and administered a steroid injection and recommended physical therapy.
10. An MRI conducted December 4, 2000 revealed no rotator cuff tear, even though Dr. Ross testified that it is possible for a tear to be present and not be shown on an MRI. A repeat injection was administered to Plaintiff on December 12, 2000, and she was placed on light duty work restrictions.
11. As of January 9, 2001, Dr. Ross released Plaintiff to return to work at her regular duties on a trial basis. Plaintiff continued to experience left shoulder pain, such that Dr. Ross placed Plaintiff back out of work by January 22, 2001 and ordered a repeat MRI and dye test that was conducted January 26, 2001. The results of this second MRI revealed a tear of Plaintiff's left rotator cuff. Plaintiff was then referred to Dr. Christopher Brumfield for surgical evaluation.
12. Plaintiff underwent a left shoulder arthroscopy with acromioplasty and distal clavicle resection and rotator cuff repair on March 9, 2001. Plaintiff was placed out of work as of March 12, 2001 and remained out of work until being released to return to regular duty on June 28, 2001.
13. Dr. Brumfield assigned Plaintiff a twenty percent (20%) permanent partial disability rating of her left arm upon reaching maximum medical improvement as of his letter dated November 19, 2001.
14. While out of work as a result of her injury, Defendants paid to plaintiff short-term and long-term disability payments totaling $3,840.99 from an employer-funded plan.
15. As a result of her work-related injury, Plaintiff was unable to earn any wages in any employment from January 22, 2001 through June 28, 2001.
16. Dr. Ross testified and the undersigned finds that the left shoulder condition for which Plaintiff sought treatment was proximately caused by the injury by accident she sustained on August 16, 2000.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On August 16, 2000, Plaintiff sustained an injury by accident, arising out of and in the course of her employment with the Defendant-Employer, involving an interruption of Plaintiff's normal work routine and the introduction thereby of unusual conditions, resulting in an injury to her left shoulder. N.C.G.S. § 97-2(6).
2. Based on calculations from the Form 22, Plaintiff's average weekly wage is $437.06, yielding a compensation rate of $291.39. N.C.G.S. § 97-2(5).
3. As a result of her compensable injury of August 16, 2000, Plaintiff was unable to earn any wages in any employment from January 22, 2001 through June 28, 2001 and is entitled to temporary total disability benefits for the same time period at a rate of $291.39 per week. N.C.G.S. § 97-29.
4. As a result of her compensable injury of August 16, 2000, Plaintiff sustained a twenty percent (20%) permanent partial disability of her left arm, and she is entitled to permanent partial disability benefits for 48 weeks at a rate of $291.39 per week. N.C.G.S. § 97-31.
5. Defendants are entitled to a credit for short-term and long-term disability payments made to Plaintiff in the amount of $3,840.99. N.C.G.S. § 97-42.
6. As a result of her compensable injury of August 16, 2000, Plaintiff incurred medical expenses reasonably necessary to effect a cure and/or provide relief of her symptoms, and she is entitled to payment of the same. Said medical treatment includes, but may not be limited to, treatment provided by High Point Orthopedic and Sports Medicine, North Carolina Baptist Hospital, High Point Regional Hospital and MedCentral. The bills for these and any other medical care facilities who rendered treatment to the Plaintiff resulting from her compensable injury of August 16, 2000 shall be paid by Defendants.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees awarded herein, Defendants shall pay to Plaintiff temporary total disability benefits from January 22, 2001 through June 28, 2001 at the rate of $291.39 per week. Said amount shall be paid in one lump sum, minus the credit allowed Defendants for short-term and long-term disability payments.
2. Subject to attorney's fees awarded herein, for her twenty percent (20%) permanent partial disability to her left arm, Defendants shall pay to Plaintiff permanent partial disability benefits for 48 weeks at a rate of $291.39 per week. Said amount shall be paid in one lump sum, minus the credit allowed Defendants for short-term and long-term disability payments.
3. Defendants shall pay all medical expenses incurred by the Plaintiff reasonably necessary to effect a cure, provide relief and/or lessen Plaintiff's period of disability, including, but not limited to, those expenses incurred at High Point Orthopedic and Sports Medicine, North Carolina Baptist Hospital, High Point Regional Hospital and MedCentral. Said bills shall be paid upon their submission to and approval from the Industrial Commission.
4. Reasonable attorney's fees for plaintiff's counsel are approved and shall be paid as follows: twenty-five percent (25%) of the sums due plaintiff under Paragraphs 1 and 2 of this AWARD shall be deducted from said sums and paid directly to plaintiff's counsel.
IT IS FURTHER ORDERED that this case be REMOVED from the Greensboro hearing docket.
This the 26th day of September 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER